LASATER *v.* STATE.

Opinion delivered October 15, 1917.

1. HOMICIDE—SUFFICIENCY OF THE EVIDENCE.—The evidence held to justify a conviction of voluntary manslaughter.

2. HOMICIDE—DEFENSE OF HOME AND FAMILY.—Deceased was paying attention to defendant's daughter, to which defendant objected. He refused admission to deceased to his premises, but when deceased returned, defendant assaulted and killed him, while deceased was on the public sidewalk. *Held,* under these facts it was proper for the trial court to give an instruction that "defendant had a right, as a father, to forbid deceased to come on his premises and pay court to his daughter, and to remonstrate with deceased in reference thereto."

3. HOMICIDE—PROOF OF THREATS—STATE OF DEFENDANT'S MIND.—An instruction, in a homicide case, telling the jury that it is competent to prove threats of either party, is not erroneous, when the evidence reveals statements showing the defendant's state of mind toward the deceased, rather than the expression of a threat.

Appeal from Crawford Circuit Court; *James Cochran,* Judge; affirmed.

*J. H. Evans, W. H. Neal* and *Hill, Fitzhugh & Brizzolara,* for appellant.

1.   There is no evidence whatever showing that defendant was guilty of criminal homicide.

2.   It was error to refuse instruction "A" requested by defendant, that he had the right to forbid Chastain to come on his premises to pay court to his daughter, etc. 162 U. S. 499.

3.   Instruction No. 15 given by the court was erroneous, misleading and prejudicial. It assumed that defendant had made threats. No. 18 given was also prejudicial. 85 Ark. 48; 99 *Id.* 462.

4.   Lasater was on his own premises and there was no duty to retreat. 55 Ark. 593; 62 *Id.* 286; 69 *Id.* 648; 104 *Id.* 616. Wharton on Homicide, § 251, 296, 323. Defendant was not a criminal nor a violator of the law, but simply sought to protect himself, his family and home.

*John D. Arbuckle,* Attorney General, and *T. W. Campbell,* Assistant, for the appellee.

1.   The evidence warrants the verdict.   It is amply sufficient to justify the conviction.   Chastain was not on appellant's premises, nor attempting to enter same.

2.   The 14th instruction is in the language of Kirby's Digest, § 1798 and not error in this case.

3.   The 15th instruction is not error.   There was evidence to sustain it.   It does not assume that any threats had been made.

4.   The 18th given is not erroneous.   49 Ark. 543; 100 *Id.* 132.   Instructions must be considered as a whole, and it is not error when an instruction fails to declare the whole law, if given in other instructions.   82 Ark. 64; 85 *Id.* 179; 80 *Id.* 360.

5.   It was not error to refuse instruction "A."   Instruction "B" sufficiently covered the law on this point.

6.   Instruction "G" was properly refused.   Judges shall not charge juries with regard to matter of fact, but declare the law.   Const. Art. 7, § 23; 34 Ark. 469; 43 *Id.* 289; 45 *Id.* 165; 49 *Id.* 165; 55 *Id.* 244.

The court committed no errors.

McCULLOCH, C. J.   The indictment in this case charged the crime of murder in the second degree in the killing of one Clyde Chastain, but the trial jury returned a verdict finding the defendant guilty of involuntary manslaughter.

(1)   The first contention of defendant's counsel is that the evidence is not sufficient to sustain the verdict. The killing occurred on July 20th, 1916, out in the street in front of the defendant's residence, in the suburbs of the town of Mulberry, in Crawford county, late in the afternoon, or early in the evening.   Defendant had a daughter, Naomi by name, then 17 years of age, and deceased, Clyde Chastain, a young man scarcely of full age, was paying court to Naomi.   Defendant and his wife had made objections to the attentions of Chastain to their daughter and had forbidden him to come to the house to visit her, and the quarrel which resulted in the killing of Chastain had its beginning in a conversation between defendant and

Chastain concerning the former's efforts to visit defendant's daughter. According to the undisputed evidence, deceased was armed with a large sized pocket knife and had it in his hand at the time, but it was never opened. The killing was done by defendant with a pocket knife. He stabbed Chastain several times with the knife, inflicting three serious wounds on the body and two or three minor cuts on the arm. The most severe wound, according to the testimony of the examining physician, was a deep stab or incision inflicted by a downward blow which struck above the collar bone, a little to the right.

Deceased lived with his parents a short distance from the home of defendant, but none of his people were present at the difficulty, although they were at home and arrived upon the scene shortly after the fatal blows were struck and in time to escort the wounded man to his home, where he soon died. The mother and father of deceased, and his uncle, all of whom were present at their home near the scene of the difficulty, testified about being attracted by the noise and going out to the scene of the difficulty, but they all testified that they came in sight too late to see the commencement of it. They testified that they saw what appeared to be blows passing between the two men who were engaged in a fight out in the street in front of defendant's house. The father of deceased testified that when he came out into the road where he could see what was going on he observed that his son (deceased) was stooping down, and that defendant was bringing his hand down with considerable force about deceased's shoulder or neck, and that when he (witness) walked down to the scene of the difficulty defendant turned and went across the fence into his own house. The account of the difficulty in detail comes mostly from defendant himself. It appears from his testimony that several months before the killing occurred he and his wife had made objections to the attention of Chastain to their daughter for the reason that his wife had discovered Chastain hugging Naomi and had driven him from the premises on that account. The next day deceased came to defendant's house and

apologized for his conduct, but defendant refused to discuss the incident with him and thereafter deceased abandoned his attentions to the girl, until about a week before the killing, when he went to see defendant at his house and made request that the girl's parents reconsider their decision and allow him to resume his attentions to their daughter. The consent of the girl's parents was not obtained, but notwithstanding, deceased came to defendant's house about noon on the day of the killing and left a book there for Naomi, and defendant's wife refused to permit him to enter and closed the door in his face. In the meantime deceased had met Naomi at Sunday School and escorted her home. When defendant came home from his work that afternoon he was told by his wife about deceased having been there to leave the book. He saw deceased coming up the street, and decided that he would see deceased and again remonstrate at his conduct in coming there to see his daughter. He testified that he went into the house then and deceased stopped on the outside of the gate and that he went out to speak to deceased concerning the matter. When defendant walked out to the gate he told deceased that the latter's attention to his daughter was not approved by himself and his wife, and that deceased must not come there to see her, or bring books for her. He testified that deceased seemed mad and nervous, and that he told deceased to go on home, that he didn't want any trouble, but that deceased replied that where he was standing was a public walk and that he said to deceased in reply, "I will see if I can make you," and looked around for a stick, but saw none and walked to the garden fence, about 20 yards distant, and picked up a rake and turned to use it in driving deceased from the gate, but his wife stopped him and he put the rake down and started back toward the house. Just then deceased called to Naomi and she ran out of the house toward deceased, and defendant went out to the gate to compel her to go back to the house. She was then standing inside the fence and deceased was just outside. Defendant slapped his daughter and told her to go into the house. At that time deceased

had the knife in his hand, but it was unopened. Defendant's description of what then occurred is in the following language:

"He was almost in reach of me; I realized my danger at an instant; I knew there was no use to have attempted to run if he could have gotten the knife open and I grabbed at that knife; my intention was to disarm him; I grabbed at it and I got over the fence and in grabbing at it I received a blow that brought me to the ground; I got up and I received a light blow that brought me to the ground; realizing my defenseless condition after the second time I had been knocked down, I arose with my knife in my hand; in my honest opinion I was knocked down five or six times; from the time I got up I tried to strike that boy with that knife; if I was ever straight until the last time I arose I tried to strike him; I could not swear the number of times I was knocked down; I went by the number of bruises on my head; I had four or five that were sufficient to knock a man down; I remember the last time I was knocked down, I arose or partly arose and I received another blow in the back of my head; I didn't ask the doctor to dress it and didn't think about it; it didn't bring me to the ground for I didn't think about it; I arose straight again after that; when I arose this young Chastain was walking directly from me; I turned at once and stepped to the fence and went into the house and washed my head."

It is undisputed that defendant cut deceased with a knife a number of times, and that the knife in the hands of deceased was unopened. According to the statement of defendant himself, he went outside of his own yard to engage deceased in a difficulty. He says that he did that in order to defend himself against an anticipated attack from deceased, but the evidence justified the conclusion that it was wholly unnecessary for him to cross the fence. There was no evidence at all that deceased was attempting to come inside the yard to attack defendant, and the act of defendant in going outside of his own yard and seizing hold of the knife in the hands of deceased could properly have been treated by the jury as a voluntary en-

trance into the combat.  The evidence justifies the finding also that defendant having voluntarily entered into the fight, made no effort at all to retire from it, but, on the contrary, repeatedly used his weapon until he had slain the deceased.  This view of the evidence justified a conviction of voluntary manslaughter and defendant is in no attitude to complain that the jury has found him guilty of a lower degree of homicide than the evidence warrants.

(2)   The next assignment of error alleged is the refusal of the court to give the following instruction:

"Defendant had the right, as a father, to forbid Clyde Chastain to come on his premises to pay court to his daughter, Naomi, and to remonstrate with Chastain in reference thereto."

The refused instruction undoubtedly contains a correct statement of the law in the abstract concerning the rights of a parent, but it would have been erroneous and misleading for the court to have given the instruction in that form under the circumstances of this case.  It is true that, according to the testimony of defendant himself, he went out to the gate to renew his objections to deceased coming on the premises to pay court to his daughter and to remonstrate against his conduct in coming there, but at the time the difficulty occurred the controversy between the two men had passed beyond that stage and defendant went off of his own premises, not for the purpose of renewing his objections, but to engage in a difficulty with deceased, or, to accept his own statement as literally true, for the purpose of disarming the deceased.  To have singled out, under those circumstances, the abstract proposition of law contained in this instruction would have constituted an erroneous application of it, as it might have lead the jury to believe that defendant was within his rights in all that he did because he had gone out there for the purpose of expressing his objections to deceased paying attentions to his daughter.  The instruction, if properly guarded with an explanation as to what constituted a remonstrance, would have been an appropriate one to give to the jury in determining the motives of defendant

in going out to the gate where deceased was standing, but to give the instruction in the form requested without any further explanation would have been calculated to mislead the jury and to lay undue emphasis upon the right of the parent to object to the attention of his daughter. The jury has acquitted the defendant of the higher offense and has thus eliminated from the case any question of malice, so the real turning point in the case, so far as concerns the particular offense of which defendant was convicted, is the question of the right of self-defense, which has nothing to do with the motives of the defendant in going out to the gate where deceased was present. We do not think, in any view of the case, that the refusal to give the instruction was erroneous or prejudicial.

(3) The next objection made is that the court erred in giving an instruction telling the jury that it was competent to prove threats of either party. The ground of the objection is that there was no evidence tending to show threats on the part of the defendant. The court told the jury that threats might be considered "for the purpose of shedding light upon the state of mind existing between the parties at the time of the difficulty and also for the purpose of shedding light upon which of the two was the aggressor in the combat." A witness testified that he had a conversation with defendant about noon of the day of the killing in which defendant stated that he was having trouble in his family as to the attentions of Chastain to his daughter, to which he objected, and that defendant made the statement in that conversation that he did not want "the red-headed son-of-a-bitch," meaning Chastain, to marry his daughter. Considering the subject and the manner in which the statement was made, the jury might have treated it as an indirect threat, and we cannot say that there was an entire absence of evidence on that subject. Moreover, the court in this instruction was dealing with the question of circumstances as indicating the state of mind of the parties, and this statement of the defendant, whether treated as a threat or not, was competent testimony to consider for that purpose, and the instruction

was not prejudicial although the court inadvertently characterized the evidence as a threat instead of a mere statement indicating the defendant's state of mind towards the deceased.

There is another assignment of error concerning instruction No. 18, on the subject of self-defense. The instruction is not in good form, but we think it correctly states the law of self-defense, and that there was no error in giving it.

The killing was a most unfortunate incident, as there appears to have been no real enmity between the parties. They were close neighbors and the two families were on very friendly terms. There was no settled malice existing between the two principals to the difficulty, which arose entirely on account of the discussion between them as to the right of the young man to visit the defendant's daughter, Naomi, with whom his relations, according to the evidence, were entirely honorable. But, however unfortunate the incident was, the law has been violated and the jury has inflicted a light punishment, which the evidence in the case fully justifies.

We find no error in the record and the judgment must be affirmed. It is so ordered.